**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DOUGLAS EMCH, II,

       Plaintiff,

v.                                 Case No. 11-13275

SUPERIOR AIR-GROUND AMBULANCE
SERVICE OF MICHIGAN, INC.,

       Defendant.

_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this employment-discrimination suit, Defendant Superior Air-Ground
Ambulance Service of Michigan, Inc., has filed a motion for summary judgment on
Plaintiff Douglas Emch's claims under the Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12117, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2617.
The motion has been fully briefed, and the court determines a hearing to be
unnecessary.  *See* E.D. Mich. LR 7.1(f)(2).  For the following reasons, the court will
grant summary judgment.

**I.  BACKGROUND**

Defendant is a private ambulance service that provides patients with emergency
and non-emergency transportation to and from medical facilities, including through
contracts with certain cities to serve as backup for 911-response personnel.  (Ratliff
Dep. 11:8-9, 12:16-23, Jan. 6, 2012, Def.'s Ex. 2, Dkt. # 17-3.)[1]  In December 2005,

---

[1] For ease of access, the initial citation of each fact exhibit contains the party's
exhibit number as well as the docket number assigned to that exhibit by the court.

Plaintiff began working for Defendant as an emergency medical technician ("EMT"). (Emch Aff. ¶ 1, Pl.'s Ex. 1, Dkt. # 20-2.)  As an EMT, Plaintiff's primary job duties were to provide safe transportation and appropriate care to Defendant's patients.  (EMT Job Description 2, Def.'s Ex. 4, Dkt. # 17-5.)  During a shift, Plaintiff and a partner EMT were assigned an ambulance to respond to calls issued them by Defendant's dispatch center. (Ratliff Dep. 96:2-97:6.)  When working a call, one EMT would typically serve as the driver while the other attended the patient, and both EMTs were responsible for completing required billing forms and other paperwork.  (Ratliff Dep. 11:18-12:4.)  At the time relevant to this lawsuit, Plaintiff exclusively worked non-emergency calls, although he was expected to provide emergency response services should the need arise. (Emch Aff. ¶ 2; George Dep. 50:1-3, Jan. 12, 2012, Def.'s Ex. 5, Dkt. # 17-6.)

        Defendant claims that only about 30% of an EMT's shift would be spent actively responding to calls, with the remaining 70% constituting downtime.  (Def.'s Statement of Facts ¶ 7, Dkt. # 17; Ratliff Dep. 76:13-15.)  During that downtime, Defendant avers, EMTs could eat or pick up other necessities for their shift, as long as they stayed in the vicinity of a "posting area" specified by dispatch.  (George Dep. 49:15-25.)  Moreover, when an EMT team is waiting at a medical facility while a patient receives treatment, Defendant alleges that only one EMT must remain with the patient, leaving the other at liberty to visit other parts of the facility and take meal or snack breaks.  (Ratliff Dep. 12:16-13:11, Pl.'s Ex. 2, Dkt. # 20-3.)  Plaintiff, for his part, disputes this characterization of his on-the-job free time, alleging that he experienced only short periods of downtime

---

Unless otherwise noted, citations to depositions refer to Defendant's exhibits.

between calls and that he was occupied with ongoing responsibilities to the patient during time spent waiting at treatment facilities.  (Emch Aff. ¶¶ 4-6.)

Plaintiff, a Type I diabetic, claims that, in 2008, he began experiencing problems managing his disease due to his inability to eat at regular intervals while at work, as the structure of his shifts forced him to take meals only during unscheduled periods of downtime that might not coincide with his need for food.  (*Id.* ¶¶ 12, 14.)  A February 24, 2009 letter to Defendant from Plaintiff's physician, Dr. Thomas Mianecki, stated that a "low-carb diet" of "multiple small meals a day" is "extremely important" to controlling Plaintiff's "insulin-dependant diabetes."  (Letter from Thomas Mianecki (Feb. 24, 2009), Def.'s Ex. 7, Dkt. # 17-8, at 7.)  Restricting Plaintiff's ability "to follow a proper diabetic diet" and "to eat at the proper intervals and on multiple occasions," the letter warned, will "lead to extremely poor glucose control and episodes of hyper/hypoglycemia."  (*Id.*)

Thus, Plaintiff asked Defendant to provide him with an accommodation under the ADA of prescheduled, fifteen-minute meal breaks every four hours during his shifts,[2] (Emch Aff. ¶¶ 13-14, 27; Emch Dep. 41:15-42:8, Dec. 14, 2011, Pl.'s Ex. 5, Dkt. # 20-6), in accordance with Dr. Mianecki's recommendation that he be allowed "the opportunity to . . . take meals when necessary" and "to not skip meals when they are appropriately due," (Feb. 24, 2009 Letter).  Plaintiff also sought permission to take intermittent leave under the FMLA whenever his unstable glucose levels prompted hypo- or

---

[2]Plaintiff initially told Defendant that he also needed designated breaks to administer regular insulin injections.  (*See* Feb. 24, 2009 Letter; Emch Aff. ¶¶ 13-14.) However, the failure-to-accommodate claim presented in the complaint relies solely on Defendant's denial of meal breaks, so the court recounts only those facts relevant to that aspect of Plaintiff's request for an accommodation.

hyperglycemic symptoms.  (FMLA Certification (Mar. 9, 2009), Def.'s Ex. 7, Dkt. # 17-8, at 2-6; Emch Aff. ¶ 23.)

Defendant certified Plaintiff as eligible for intermittent FMLA leave, (Mar. 9, 2009 FMLA Certification), but it denied his requested accommodation of designated meal breaks, as communicated to him in a March 31, 2009 letter from Human Resources Manager Sandra Ratliff.[3]  (*See* Letter from Sandra Ratliff to Doug Emch (Mar. 31, 2009), Def.'s Ex. 9, Dkt. # 17-10.)  Defendant alleges that it could not provide such breaks "without undue hardship to the company," as doing so would require it to take Plaintiff's ambulance out of service during those breaks.  (*Id.*)  Reducing the number of available ambulances in this manner would, according to Defendant, impede its ability to respond to patient calls within the thirty-minute period required by its contractual obligations.  (*Id.*; Heil Dep. 20:15-21:5, Feb. 29, 2012, Def.'s Ex. 10, Dkt. # 17-11; Ratliff Dep. 96:11-97:14.)  It could also adversely affect patient care.  (Mar. 31, 2009 Letter.)

On the other hand, Plaintiff avers that, with some "advance planning," Defendant could have granted his accommodation with "minimal disruption" to its business.  (Emch Aff. ¶ 25.)  Defendant regularly had twenty-seven to thirty-three ambulances posted in

---

[3]Plaintiff alleges that, prior to Dr. Mianecki's February 24, 2009 letter requesting that he receive an accommodation and Ratliff's March 31, 2009 letter in response, he had presented his accommodation request in meetings with Ratliff and Station Manager Orsaute Bulluck as early as October 2008.  (Emch Aff. ¶¶ 13-15.)  During these discussions, Plaintiff avers, Ratliff and Bulluck dismissed his need for an accommodation; at one point, Bulluck purportedly "compared [Plaintiff's] hypoglycemia to diarrhea stating that if [Plaintiff] asked for a break to get food it would be like [an EMT] saying he had an upset stomach and could not pull a call."  (*Id.* ¶¶ 17-18.)  Defendant, however, denies that these meetings ever occurred, (Def.'s Reply Supp. Mot. Summ. J. iv), and Plaintiff testified at deposition that Dr. Mianecki's letter was his first request for an accommodation, (Emch Dep. 94:13-16, Def.'s Ex. 3, Dkt. # 17-4.)

the tri-county area where Plaintiff worked.  (Ratliff Dep. 96:23-97:3.)  Plaintiff claims

that, on multiple occasions, he spoke with other EMTs who were on downtime when he

was given a call that interfered with his ability to break for a meal four hours into his

shift, and he saw no reason why those other EMTs could not have handled the call

instead.  (Emch Dep. 49:1-24, Pl.'s Ex. 5.)  When asked at deposition whether the

response areas for Defendant's ambulances "overlap" or if one ambulance ever

"cover[s] runs" for another, Ratliff clarified that dispatch operators typically assign calls

to the "closest[,] most appropriate" ambulance.  (Ratliff Dep. 96:7-10.)

    While Defendant denied Plaintiff's proposal of prescheduled meal breaks, it did

offer Plaintiff an alternative accommodation.  At the time of Plaintiff's accommodation

request, he had been working two, twenty-four hour shifts per week.  (Mar. 31, 2009

Letter.)   Defendant offered to place him on day-car schedule of eleven hour shifts, four

days per week.  (*Id.*)  This would allow him to eat breakfast before his shift and dinner

after his shift, thereby limiting his need for food breaks to only lunch and snacks.  (*Id.*)

Defendant further reminded Plaintiff that he is welcome to "visit hospital cafeterias or

drive-through windows between calls" or "pack a lunch cooler and snacks to eat in the

ambulance, as many . . . employees do on a regular basis."  (*Id.*)  On occasions when

Plaintiff neglected to pack food and found himself without an opportunity to purchase

something to eat at the appropriate time, Defendant indicated it would "advise [its]

dispatchers to make every attempt to accommodate [Plaintiff's] request for a meal

break."  (*Id.*)  Plaintiff was further instructed to contact Ratliff in the event that the

dispatchers were not receptive to such requests.  (*Id.*)

5

Plaintiff was dissatisfied with this alternative accommodation, which he claims was inadequate.  (*See, e.g.*, Pl.'s Counter-Statement of Facts ¶ 24.)  To start, Plaintiff declined the proposed transfer from twenty-four hour shifts to a day-car shift, (Ratliff Dep. 21:14-22:3), as the twenty-four hour shift schedule yielded more income and it was "better for his lifestyle," (Curtis Dep. 14:21-15:5, Jan. 12, 2012, Def.'s Ex. 15, Dkt. # 18-3).  He also indicated to Ratliff that he believed it was easier for him to find time for meal breaks on the twenty-four hour shift, (Ratliff Dep. 26:4-14), but Ratliff did not think this was the case from an operational standpoint, (*id.* 26:15-27:5).  Plaintiff now attests that he preferred the twenty-four hour shift schedule because it gave him more days between shifts to stablize his blood-glucose levels, which were consistently thrown off balance when he was unable to eat during his shifts, (Emch Aff. ¶ 29); but there is no indication in the record that Plaintiff ever articulated this rationale to Defendant.

Either way, it appears that, while Plaintiff continued to work twenty-four hour shifts, he also continued to have problems regulating his diet.  One day in March 2009 and again on May 3, 2009, lack of food caused Plaintiff's blood sugar to drop so low that he exhibited symptoms severe enough to necessitate immediate medical treatment from his co-workers.  (Ratliff Dep. 30:14-31:9; Run Form (Mar. 2009), Def.'s Ex. 12, Dkt. # 18; Documents Re: May 3, 2009 Incident, Def.'s Ex. 13, Dkt. # 18-1.)

After Plaintiff's second hypoglycemic episode, on May 7, 2009, Defendant placed Plaintiff on unpaid administrative leave pending a fitness-for-duty examination by an independent medical examiner.  (Compl. ¶ 27, Dkt. # 1; Ratliff Dep. 30:22-31:15.)  Plaintiff was told by Defendant's General Manager, Jeff George, that the leave was prompted by a concern for Plaintiff's health, (Compl. ¶ 27), but Plaintiff had a different

6

view.  On May 26, 2009, he filed a charge of discrimination with the Michigan Department of Human Rights ("MDHR") and the Equal Opportunity Employment Commission ("EEOC"), alleging that Defendant had actually imposed the leave because it did not want to comply with his reasonable request for a disability accommodation. (Charge of Discrimination (May 26, 2009), Def.'s Ex. 26, Dkt. # 18-14.)  The charge was ultimately dismissed by both agencies due to insufficient evidence.  (*Id.*)

Meanwhile, Plaintiff was examined on May 16, 2009, by Defendant's independent medical examiner, Dr. Robert Kantor, who issued a preliminary fitness-for-duty report on May 16, 2009, and an addendum with his final conclusions on May 28, 2009.  (IME Report (May 16, 2009), Def.'s Ex. 14, Dkt. # 18-2, at 3-6; IME Addendum (May 28, 2009), Def.'s Ex. 14, Dkt. # 18-2, at 7-9.)  Dr. Kantor confirmed Plaintiff's diagnosis of Type I diabetes and concluded that, while Plaintiff was "physically able to perform his work activities, . . . he needs to take some additional steps to ensure he does not have episodes of hypoglycemia and it would seem the employer may need to make some accommodation as well."  (IME Report 5.)  Dr. Kantor opined that Plaintiff should have sufficient opportunities to obtain food at appropriate intervals during a typical shift:

> In reviewing the run times, it does appear that there would be adequate time for Mr. Emch to quickly obtain something to eat.  The locations documented in these run times actually are areas I am very familiar with and I do know that there are numerous restaurants in that area which would be readily available for a quick stop to avoid the episodes of hypoglycemia.

(*Id.*)

Dr. Kantor also looked favorably on Defendant's suggestion that Plaintiff pack food that could be consumed in the ambulance:

7

> The idea of allowing the claimant to bring food with him on his runs also appears to be appropriate and using sealed containers should prevent any possibility of contamination. He can use hand sanitizer to clean any bacteria off his own hands. There certainly is enough time on the run sheets to eat if he has food with him.

(IME Addendum 2.) In conclusion, Dr. Kantor noted his "overall medical impression" that Plaintiff "is not taking enough personal responsibility to control his condition." (*Id.* at 3.) He suggested allowing Plaintiff to return to his job for a four-month trial period followed by a reevaluation to "better determine if he is willing and capable of controlling his condition while performing his job as an EMT." (*Id.*)

Ratliff and George met with Plaintiff to discuss the results of the IME on June 2, 2009. (Compl. ¶ 34.) Defendant cleared Plaintiff to return to work, but put him on a specially designed, day-car schedule of nine hours per day, four days per week. (*Id.*; Curtis Dep. 15:9-20; Ratliff Dep. 21:18-20; Timecards, Def.'s Ex. 16, Dkt. # 18-4.) George and Plaintiff's supervisor, Andrew Brown, also spoke with operations staff and dispatchers to ensure that Plaintiff was given breaks to eat during his shifts. (Brown Dep. 66:3-6, Jan. 18, 2012, Def.'s Ex. 17, Dkt. # 18-5; George Dep. 25:4-17.)

Plaintiff remained dissatisfied with Defendant's efforts to accommodate his need for a meal break. Despite Defendant's insistence that Plaintiff had enough on-the-job downtime to eat in accordance with his dietary requirements, (Ratliff Dep. 76:5-15), Plaintiff claims that dispatch often instructed him to take meal breaks too far in advance of, or too late after, the approximately one-hour window, four hours into his shift, when he needed to eat, (Emch Dep. 131:1-21, Pl.'s Ex. 5). Additionally, Plaintiff avers that, if he attempted to contact Ratliff or another manager during shifts when he was not given an adequate meal break, his phone calls went unanswered. (Emch Aff. ¶ 61.)

8

Plaintiff also maintains that Defendant's suggestion of bringing food that he could eat in the ambulance while en route to or from a call was inadequate.  Plaintiff admits that he always brought enough snacks to get him through the day, and that he did not have difficulties finding opportunities eating those snacks "when [his] life depended on it."  (Emch Dep. 70:2-24, Pl.'s Ex. 5.)  However, he insists that he could not pack enough food to constitute a sufficient meal, for which he preferred to eat hot food from a restaurant.  (Emch Dep. 54:20-57:11; Ratliff Dep. 74:19-75:1.)

Further, Plaintiff would not agree to eat inside of the ambulance, as he believed that practice to be unsanitary and against the law.  (Emch Dep. 132:22-133:5, Pl.'s Ex. 5.)  In fact, eating in any area with which patients come into contact is against regulations of the Michigan Occupational Health and Safety Administration ("MIOSHA"), (see MIOSHA R 325.70006(2)(f), Pl.'s Ex. 9, Dkt. # 20-10, at 5), although EMTs could eat in the driver compartment of an ambulance if it was blocked off from the patient compartment, (George Dep. 38:3-9; Heil Dep. 49:7-51:1, Pl.'s Ex. 16, Dkt. # 20-16; MIOSHA Q&A, Pl.'s Ex. 9, Dkt. # 20-10, at 13).  Defendant contends that the ambulance Plaintiff was usually assigned had a door that, when closed, would separate the driver and the patient compartments, thereby providing Plaintiff with a space in which to eat without contravening MIOSHA regulations.  (Heil Dep. 51:25-53:6, Pl.'s Ex. 16.)  Plaintiff, however, avers that this door did not latch properly and would not stay closed, a fact which he claims to have reported to his supervisors.  (Emch Aff. ¶ 68.)  Plaintiff also believes that the front of Defendant's ambulances were contaminated because the EMTs did not clean them properly, (Emch Aff. ¶ 76; Emch Dep. 124:12-126:4, Pl.'s Ex. 5), to the point that he refused to bring a meal to consume outside of the

9

ambulance because, immediately prior to eating, he would have to touch the inside of the ambulance door to exit it, (Emch Dep. 133:6-134:9, Pl.'s Ex. 5).

Nevertheless, Plaintiff continued to work during his four-month trial period without suffering another on-the-job hypoglycemic episode.  In October 2009, he had a follow-up examination with Dr. Kantor, who submitted to Defendant a report that had a more positive prognosis regarding Plaintiff's ability to manage his disease.  (*See* Fitness for Duty Report (Oct. 16, 2009), Pl.'s Ex. 10, Dkt. # 20-11.)  Taking special note of the fact that Plaintiff had installed an insulin pump to help regulate his sugars, Dr. Kantor recorded the following observations:

> Mr. Emch has taken significant positive steps to controlling his diabetes; specifically use of the insulin pump will help greatly to normalize his sugars. He still does need to eat on a more routine basis, however.  Mr. Emch indicated that the day run only actually has worsened his sugars.  I cannot understand how that physiologically could be the case and I suspect his dislike of this shift has much more to do with how it affects his income. Having stated that, with the addition of the insulin pump I have no objection to his return to a more irregular schedule.  The remaining changes that still need to be made need to come form the employer.  I suggest scheduling ten minutes to eat at fairly regular intervals into Mr. Emch's schedule.  Such a break for a meal should be adequate if this is done within an hour interval for each shift; still it is up to the employer to decide if this is a reasonable accommodation.  If the employer is able to meet this accommodation, then I do feel that Mr. Emch is physically capable of performing his duties as an EMT.

(*Id.* at 3-4.)

Although Dr. Kantor cleared Plaintiff for "a more irregular schedule," (*id.* at 4), during the time period between October 2009 and April 2010 Defendant twice denied Plaintiff's application to return to an open, twenty-four hour shift position, (Emch Aff. ¶¶ 45-47).  Plaintiff avers that, in a meeting on September 28, 2009, George told him that he was not being returned to his preferred schedule because of his accommodation

10

request.  (*Id.* ¶ 39.)  Shortly thereafter, on October 2, 2009, Plaintiff had a meeting with Ratliff and Defendant's Vice President of Operations David Curtis, during which Curtis allegedly "yelled at [Plaintiff] and told [him] that if [he] did not like it there [he] could leave," to which Plaintiff "explained that [he] was only asking for accommodations to eat during [his] shift."  (*Id.* ¶ 40.)  On June 16, 2010, Plaintiff filed a complaint with the EEOC claiming that Defendants continued to deny him a reasonable accommodation and that refusing to return him to twenty-four hour shifts amounted to disability discrimination and retaliation for his accommodation request.  (Charge of Discrimination (June 16, 2010), Def.'s Ex. 27, Dkt. # 18-15.)

During this time period, Plaintiff and Defendant had continued to butt heads regarding the sufficiency of his diabetes accommodation; in Plaintiff's eyes, things worsened after he filed the EEOC complaint.  (Emch Aff. ¶ 50.)  It is apparent from the record that Defendant made some efforts to work with Plaintiff to ensure that he could eat on the schedule he requested.  Various management personnel, including George and Christine Baltes, the Operations Supervisor, held meetings with Plaintiff as part of an ongoing discussion about Plaintiff's accommodation.  (Email from Christine Baltes to Andy Brown, et al. (June 15, 2010, 19:59 EST), Def.'s Ex. 11, Dkt. # 17-12, at 2.)  Dispatch operators were regularly instructed to provide Plaintiff with a meal break at the four-hour mark, and they often did alert Plaintiff when such opportunities arose.  (*See* Emails and Notes Re: Breaks, Def.'s Ex. 11, Dkt. # 17-12.)  At some point, Defendant

also offered to install a refrigerator in Plaintiff's ambulance to help ensure that he could keep enough food on hand to sustain him throughout the work day.[4]

Plaintiff, on the other hand, kept informing his supervisors that these breaks were either not coming at the appropriate times or did not offer him enough time to purchase food and eat it.  (Emch Dep. 132:9-21, Pl.'s Ex. 5.)  On numerous occasions, his frustration would manifest in rude retorts to dispatch operators' directions that he should eat and in angry complaints to Ratliff and others.  (Emch Dep. 131:1-21, Pl.'s Ex. 5; Ratliff Dep. 74:9-14.)  For example, on July 17, 2010, Plaintiff spoke with Balthus three hours and forty-five minutes into his shift, at which point Balthus directed that he could take twenty minutes to eat.  (Email from Christine Balthus to Andy Brown, et al. (July 17, 2010, 12:47 EST), Def.'s Ex. 11, Dkt. # 17-12, at 5.)  In response, Plaintiff allegedly said that "he thinks its [sic] 'funny' that [Balthus] dictate when he should eat."  (*Id.*)  Plaintiff called Balthus again about two hours later, saying he had to go home because he had been unable to eat; when Balthus asked why he had not taken advantage of the twenty-minute break she offered earlier, he replied that "he could not possibly slam down food in such a short amount of time."  (Email from Christine Balthus to Andy Brown, et al. (July 17, 2010, 16:10 EST), Def.'s Ex. 11, Dkt. # 17-12, at 5.)

------

[4]It is somewhat unclear when Defendant proposed the refrigerator accommodation.  A December 16, 2010 memorandum from Defendant suggests that it had been offered at some point prior to that date, (*see* Memorandum (Dec. 27, 2010), Def.'s Ex. 22, Dkt. # 18-10), but Plaintiff attests that he had never before been given this option, (Emch Aff. ¶ 67; Emch Dep. 87:22-88:4, Pl.'s Ex. 5).  In any case, Plaintiff maintains that this, too, would be an inadequate accommodation, because a refrigerator would have to be placed in the rear, patient compartment, and storing food there would violate MIOSHA regulations.  (Emch Dep. 88:18-89:3, Pl.'s Ex. 5.)

On August 6, 2010, Plaintiff was given a written warning by Brown for "[u]nprofessional and unethical behavior." (Emch Corrective Action Notice (Aug. 6, 2010), Def.'s Ex. 35, Dkt. # 22-7, at 2.) Prior to this, Brown characterizes Plaintiff as a "fairly good," "reliable" employee who "knew his job" and had satisfactory "clinical abilities." (Brown Dep. 37:22-38:2, Pl.'s Ex. 7, Dkt. # 20-8.) Nevertheless, Brown recalls some instances when he had to "have a conversation" with Plaintiff and take "corrective action," (*id.* at 21:12-19, Def.'s Ex. 40, Dkt. # 22-12), including one occasion when Plaintiff received informal discipline for throwing a bottle at another employee, (*id.* at 20:6-21:11).

The incidents giving rise to the August 6, 2010 warning occurred on August 3, 2010, when, according to Brown, Plaintiff spoke rudely to Brown during a telephone call held in earshot of a patient. (*Id.* at 34:15-35:18, Def.'s Ex. 17.) Additionally, Plaintiff purportedly urged a patient to file a complaint with Defendant concerning a mechanical problem with the air conditioning in his ambulance, rather than attempting to smooth things over with the patient. (*Id.* at 23:15-24:5, 28:22-29:21, 32:2-19, Def.'s Ex. 40.) Plaintiff, of course, has a different view of these events. He avers that he had not been rude to Brown during their telephone conversation, which he had terminated in order to tend to the patient. (Emch Dep. 149:1-4, Pl.'s Ex. 5.) He also claims to have reported that the ambulance's air conditioning was not working properly three times prior to August 3, 2010, yet Defendant had neglected to fix the problem. (Emch Aff. ¶ 54; Emch Dep. 141:2-10, Pl.'s Ex. 5.) Moreover, he alleges that he acted in accordance with company policy when he instructed the patient to lodge a complain. (Emch Dep. 143:10-144:10, Pl.'s Ex. 5.) Because of this, Plaintiff feels the August 6, 2010

13

discipline was "nothing more than retaliation for [his] ongoing dispute with management regarding [his] request for accommodation." (Emch Aff. ¶ 56.)

The stalemate between Plaintiff and Defendant over the adequacy of Plaintiff's accommodation continued through the fall of 2010. Later in August 2010, Plaintiff was again hospitalized for irregular blood sugar precipitated by, in his view, Defendant's refusal to accommodate his disability. (Emch Aff. ¶ 57.) While Plaintiff was recovering from this episode, Dr. Mianecki wrote a second letter to Defendant confirming that Plaintiff's "chronic, ongoing, and lifelong" diabetes necessitated "a regular eating pattern" of meals "approximately 3-4 times/day" to "avoid periods of hyperglycemia." (Letter from Thomas Mianecki (Aug. 23, 2010), Pl.'s Ex. 21, Dkt. # 20-22.)

Plaintiff also had more unpleasant encounters with his supervisors regarding his accommodation. Ratliff documented a telephone conversation with Plaintiff that occurred about six hours into his shift on October 5, 2010, during which Plaintiff: "ranted" at her about not having time to eat both slices of pizza he had bought earlier that day due to a back-to-back call schedule; declined her suggestion to eat at two nearby establishments, suggesting that eating now would do him no good and it was the company's fault that he had not been able to eat sooner; and stated Defendant could not force him to bring a bag lunch or snacks to avoid such situations. (Email from Sandra Ratliff to Summer Heil, et al. (Oct. 5, 2010, 23:48 EST), Def.'s Ex. 11, Dkt. # 17-12, at 3.) On December 16, 2010, Ratliff and Scott Wehrs, Defendant's regional director for Michigan, met with Plaintiff to review his run logs and identify portions of downtime when he had the opportunity to eat; Plaintiff again voiced his opinion that Defendant was not providing him with a reasonable accommodation and accused

14

Defendant of "not car[ing] about Human Life." (Email from Sandra Ratliff to Summer Heil, et al. (Dec. 16, 2010, 16:18 EST), Def.'s Ex. 18, Dkt. # 18-6, at 2; *see also* Wehrs Dep. 35:17-36:6, Mar. 2, 2012, Def.'s Ex. 6, Dkt. # 17-7.)

At this point, Defendant came to view Plaintiff's refusal to cooperate with its alternative accommodation unacceptable, and on December 27, 2012, it presented him with a memorandum outlining his "Responsibilities and Reasonable Accommodations." (Ratliff Dep. 73:12-74:4.) After reminding Plaintiff that he is "obligated to engage in a cooperative interactive process to propose reasonable accommodations that would enable [him] to perform the essential functions of [his] job," the memorandum documents examples of Plaintiff's "less than cooperative [behavior] in accepting the accommodations offered or in proposing alternative suggestions that might be effective. (Dec. 27, 2010 Memorandum 1.) It went on to state several "conditions of employment" that would go into effect immediately, principally "[e]ating on a regular basis" either by "visit[ing] hospital cafeterias, fast food drive-through windows, restaurants or any other food and beverage establishment" or storing food in the ambulance in a cooler or a refrigerator that Defendant would furnish. (*Id.* at 2-3.) The memorandum further directed that Plaintiff "must bring enough food to get [him] through an entire day if necessary" and that "[he] must eat in the ambulance if that is the only way in which to eat in the required timeframe." (*Id.* at 3.) Plaintiff's "failure to abide by these conditions of employment," the memorandum concluded, "will result in [his] termination." (*Id.*)

On January 6, 2011, Plaintiff received a one-week suspension for violating Defendant's purported policy that an EMT unit must call clear to signal that it is ready for another run before leaving the destination of a call. (Emch Corrective Action Notice

15

(Jan. 6, 2011), Def.'s Ex. 23, Dkt. # 18-11, at 1; Wehrs Dep. 59:10-23.)  The corrective

action notice given to Plaintiff at the time of his suspension indicates that Superior

employees had witnessed and reported Plaintiff and his partner driving to another

location after finishing a call and waiting an additional ten to twenty minutes before

calling clear.  (*Id.*; *see also* Borkowski Incident Report (Dec. 29, 2011), Def.'s Ex. 23,

Dkt. # 18-11, at 6; Johnson Incident Report (Dec. 29, 2011), Def.'s Ex. 23, Dkt. # 18-11,

at 7; Email from Sandra Ratliff to Scott Wehrs, et al. (Jan. 3, 2011, 14:26 EST), Def.'s

Ex. 23, Dkt. # 18-11, at 5; Notes by SW, Def.'s Ex. 23, Dkt. # 18-11, at 9.)  Plaintiff's

partners on these occasions were also given a one-week suspension.  (*See* Nowacki

Corrective Action Notice (Jan. 7, 2011), Def.'s Ex. 23, Dkt. # 18-11, at 4; Rush

Corrective Action Notice (Jan. 7, 2011), Def.'s Ex. 23, Dkt. # 18-11, at 3.)

Plaintiff again claims that this discipline was pretextual.  (Emch Aff. ¶ 80.)  He

asserts that there was, in fact, no policy in place that prohibited an ambulance from

driving away from the location of a call without calling clear; rather, he maintains, EMTs

were directed to call clear when they finished the paperwork associated with a run,

which may be completed off site.  (Emch Dep. 151:8-152:6, Pl.'s Ex. 5; Ratliff Dep.

66:21-67:4, Pl.'s Ex. 2.)  In fact, the policy Plaintiff and his partners were charged with

violating does not appear in the company handbook, (Brown Dep. 46:20-

47:6)—although Wehrs attested that it had been discussed at company meetings,

(Wehrs Dep. 72:21-73:14)—and Plaintiff avers that virtually every Superior EMT had left

a call destination and completed the required paperwork while posted at another

location prior to calling clear, (Emch Aff. ¶ 77; Emch Dep. 161:4-20).

16

Shortly after Plaintiff returned from his suspension, he submitted to Defendant his certification from Dr. Mianecki of FMLA eligibility for 2011.  (FMLA Certification (Jan. 11, 2011), Def.'s Ex. 24, Dkt. # 18-12, at 2-6.)  Almost since Plaintiff was first given permission to take intermittent leave in 2009, his FMLA absences had outpaced Dr. Mianecki's original authorization of one day every six months, (see Mar. 9, 2009 FMLA Certification 3; Emch FMLA Docs., Def.'s Ex. 8, Dkt. # 17-9), and Plaintiff's certification for 2011, like his certification for 2010, stated that he may need one-to-two days of leave up to four times per week, (FMLA Certification 3 (May 17, 2010), Def.'s Ex. 20, Dkt. # 18-8; Jan. 11, 2011 FMLA Certification 3).  The 2011 certification also indicated that Plaintiff could only work ten-hour days, one-to-two days per week.  (Jan. 11, 2011 FMLA Certification 3; accord May 17, 2010 FMLA Certification 3 (estimating that Plaintiff needed reduced work schedule of eight hour days, one-to-two days per week).)

Because the 2011 certification implied that Plaintiff may potentially be required to take an impossible eight days of leave per week, and that Plaintiff could not work his current schedule of four, ten-hour shifts per week, Defendant sought Plaintiff's permission to speak with Dr. Mianecki in order to clarify the certification.  (Heil Dep. 64:25-68:8, Pl.'s Ex. 16; Consent Form, Def.'s Ex. 24, Dkt. # 18-12, at 6.)  Despite the fact that Plaintiff never returned the consent form that would allow Defendant to contact Dr. Mianecki, meaning he was not officially recertified as eligible for FMLA leave in 2011, (Heil Dep. 69:9-72:19), Defendant continued to note that several of Plaintiff's 2011 absences might be covered by the FMLA, (see FMLA Docs. 852).

17

By this time, Plaintiff came to believe that he "was under intense scrutiny and being targeted for termination" based on the August 6, 2010 discipline, the December 27, 2010 memorandum, the January 6, 2011 suspension, and the request for clarification of his 2011 FMLA certification.  (Emch Aff. ¶ 83.)  On February 7, 2011, Plaintiff left work approximately two hours before the end of his shift because he was feeling ill after back-to-back runs allegedly prevented him from eating for too long a period of time.  (Email from Christine Baltes to Andy Brown, et al. (Feb. 7, 2011, 16:04 EST), Def.'s Ex. 25, Dkt. # 18-13, at 3.)  Defendant's records reveal that Plaintiff had been offered a break twenty-five minutes before he called off sick.  (Email from Stephanie Butler to Christine Baltes, et al. (Feb. 7, 2011, 15:28 EST), Def.'s Ex. 25, Dkt. # 18-13, at 3.)  Moreover, Plaintiff's partner for the shift later informed Ratliff that, earlier in the day, they had spent over an hour at two different medical facilities where Plaintiff could have obtained food and eaten; one of these periods occurred shortly after Plaintiff's partner overheard Plaintiff complaining to someone on the phone that he had reached the four-hour mark at which he needed to eat.  (Email from Sandra Ratliff to Summer Heil, et al. (Feb. 9, 2011, 16:48 EST), Def.'s Ex. 25, Dkt. # 18-13, at 5; Ratliff Dep. 99:17-100:10.)

Based upon this information, as well as his own assessment of Plaintiff's call logs for the day, Wehrs determined that Plaintiff had violated the December 27, 2010 memorandum by refusing to eat at the appropriate time, despite having the opportunity to do so.  (Wehrs Dep. 64:4-18, 68:6-70:2, 74:2-75:1.)  After consulting with Curtis, Wehrs terminated Plaintiff on February 11, 2011, for failure to abide by the expectations

18

set forth in the memorandum.  (Curtis Dep. 38:16-39:19; Emch Aff. ¶¶ 87-89; Wehrs

Dep. 66:7-68:5; Payroll Adjustment Form (Feb. 14, 2011), Def.'s Ex. 25, Dkt. # 18-13.)

On May 3, 2011, the EEOC issued Plaintiff a right-to-sue letter on his June 16,

2010 complaint.  Plaintiff filed this action on July 27, 2011, claiming that Defendant:

violated the ADA by refusing to accommodate his disability and to engage in an

interactive process geared towards finding an appropriate accommodation; unlawfully

retaliated against him for requesting a disability accommodation and reporting

discrimination under the ADA; and impermissibly interfered with his right to take FMLA

leave and retaliated against him for exercising that right.  After discovery concluded,

Defendant filed the instant motion for summary judgment on all Plaintiff's claims.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when

"the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When

deciding a motion for summary judgment, the court "is not to 'weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for

trial.'"  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "The central issue is 'whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it

is so one-sided that one party must prevail as a matter of law.'"  *Id.* at 497 (quoting

*Anderson*, 477 U.S. at 251-52).  "The judge's inquiry, therefore, unavoidably asks

whether reasonable jurors could find by a preponderance of the evidence that the

[movant] is entitled to a verdict . . . ."  *Anderson*, 477 U.S. at 252.

19

The party seeking summary judgment has the initial burden of showing the absence of a genuine dispute as to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties."  *Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (internal quotation marks and alterations omitted).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id.* 56(c)(1)(B).  "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan*, 342 F.3d at 497 (citing *Matsushita*, 475 U.S. at 587).

## III.  DISCUSSION

### A.  ADA Discrimination Claim

20

Plaintiff alleges in his complaint that Defendant violated the ADA by refusing him a reasonable accommodation of his diabetes.  This claim has two parts: (1) Plaintiff's requested accommodation of prescheduled meal breaks was reasonable and Defendant was obligated to implement it; and (2) Defendant did not engage in good faith in an interactive process geared towards identifying a reasonable accommodation. (Compl. ¶¶ 102-06.)  Neither claim can survive Defendant's motion for summary judgment.

### 1. Refusal to Provide Prescheduled Meal Breaks

Employers subject to the ADA may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  One form of discrimination outlawed by the ADA is an employer's refusal to "mak[e] reasonable accommodations to the known physical or mental limitations" of an "otherwise qualified, disabled employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A).  A "reasonable accommodation" under the ADA includes "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  *Id.* § 12111(9)(B).

21

Courts examine a plaintiff's claim that an employer wrongfully refused to accommodate his disability under the following framework:

(1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)).

Defendant does not contest that Plaintiff was disabled.  To meet the second element, Plaintiff "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases," *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002); that showing has been made here.  Thus, the court must consider whether Defendant has established that granting Plaintiff's request for meal breaks would impose an undue burden on its business.

As used in the ADA, "undue hardship" means "an action requiring significant difficulty or expense, when considered in light of" the following factors:

(i) the nature and cost of the accommodation needed . . . ;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

22

> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10). "To prove undue hardship, the employer has to show 'both that the hardship caused by the proposed accommodation would be undue in light of the enumerated factors, and that the proposed accommodation is unreasonable and need not be made.'" *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 782 (6th Cir. 1998) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995)). This will typically be a "case-specific" inquiry requiring the employer to "demonstrate undue hardship in the particular circumstances." *Barnett*, 535 U.S. at 402.

It is undisputed that, in order to ensure Plaintiff had a fifteen-minute break exactly four hours into every shift, Defendant would have to "down" Plaintiff's ambulance during that time, thereby rendering Plaintiff and his partner unable to respond to calls for an appreciable portion of their shift. (Heil Dep. 20:23-21:5.) According to Defendant, this "would burden other employees, compromise patient care, and jeopardize [Defendant's] contracts with its clients." (Def.'s Br. Supp. Mot. Summ. J. 4, Dkt. # 17.) Specifically, Defendant avers that, when Plaintiff's ambulance was down during his break, it would have to find other ambulances to cover calls that would normally have been assigned to Plaintiff and his partner. (*See* Ratliff Dep. 96:7-10.) For example, Plaintiff expected that, if he and his partner were in the middle of a patient transport when he hit the four-hour mark, Defendant would dispatch another ambulance crew to take over the call—an occurrence Plaintiff acknowledges is rare. (Emch Dep. 47:17-48:21, Pl.'s Ex. 5.) If

23

there was no other ambulance in the vicinity of a particular call, Defendant's ability to comply with its contractual obligation to respond to a call within thirty minutes would be jeopardized.  (Heil Dep. 20:15-21:5; Ratliff Dep. 96:11-97:14.)  For these reasons, Defendant maintains that Plaintiff's proposed accommodation poses an undue burden based on the "impact . . . of such accommodation upon the operation of [Defendant's] facility" and the "type of operation or operations of [Defendant], including the composition, structure, and functions of the workforce of such entity."  42 U.S.C. § 12111(10)(B)(ii), (iv).

Plaintiff has not presented enough evidence to create a genuine dispute of material fact calling into question the undue-burden issue.  Plaintiff repeatedly asserts that his proposed accommodation would result in only a "*de minimus* interruption in service," (Pl.'s Br. Opp'n to Def.'s Mot. Summ. J. 9, Dkt. # 20), but there is little in the record to support his contention.  Plaintiff argues that, because Defendant had twenty-eight to thirty-two ambulances operating in the tri-county area at any one time, (Ratliff Dep. 96:23-97:3), and 70% of an ambulance crew's shift was downtime, (*id.* at 76:13-15), Defendant could easily reroute Plaintiff's calls to another ambulance at his designated break time.  But, the number of ambulances Defendant has in service says nothing about the consequences of taking one of those ambulances out of commission for any length of time.  Even assuming that one or more ambulances would be down when Plaintiff needed a break, as Plaintiff alleges was often the case, it does not necessarily follow that dispatching another ambulance in place of Plaintiff's would have little or no impact on Defendant's business.  Defendant urges—and common sense strongly suggests—that there are not superfluous Superior ambulances on the road,

24

and downing just one of those units would cause ripple effects throughout Defendant's entire operation.

It is easy to see how this, in turn, threatens Defendant's contractual promise of a thirty-minute response time.  Plaintiff attempts to undercut the importance of the thirty-minute guarantee, baldly asserting that it is no more than "a business gimmick to fend off competitors" just like "Domino's Pizza's 30 minute delivery time."  (Pl.'s Br. Opp'n to Def.'s Mot. Summ. J. 10.)  This statement, bereft of any sort of evidentiary support, does not trump the testimony of Defendant's in-house counsel that Defendant's contracts do obligate it to respond to customer's calls within thirty minutes.  (*See* Heil Dep. 20:15-21:5.)  That, sometimes, Defendant is out-of-step with this requirement, as indicated in emails documenting hour-long delays that occurred on Plaintiff's final shift, (*see* Email from Stephanie Butler to Christine Baltus, et al. (Feb. 7, 2011, 15:28 EST), Dkt. # 18-13, at 3; Email from Stephanie Butler to MichiganOps (Feb. 7, 2011, 16:49 EST), Dkt. # 18-13, at 4), does not make it any less a contractual obligation.  If anything, such evidence points to the importance of having all available units ready to respond to calls at any given time.  Plaintiff has failed to produce any evidence to refute Defendant's specific allegations of undue hardship, and so he cannot show that Defendant discriminated against him under the ADA by refusing to provide him prescheduled meal breaks.

### 2. Participation in the Interactive Process

The court's inquiry does not end there, however.  While Defendant has shown that Plaintiff's proposed accommodation would render an undue burden on its operations, it was nevertheless obligated "to initiate an informal, interactive process"

25

aimed at " identify[ing] the precise limitations resulting from [Plaintiff's] disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). "Even though the interactive process is not described in the [ADA's] text, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871 (footnote omitted) (collecting cases). "When a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Id.* (quoting *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

"An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 3071 (2011). Although "the employer is not required to propose a counter accommodation in order to participate in the interactive process in good faith[,] . . . taking the extra step of proposing counter accommodations may be additional evidence of good faith." *Id.* "If an employer takes that step and offers a reasonable counter accommodation, the employee cannot demand a different accommodation." *Id.* (citing *Hedrick*, 355 F.3d at 457).

The parties' duty to engage in the interactive process began with Plaintiff's initial request for prescheduled meal breaks. After Defendant determined that this proposed accommodation would cause an undue hardship to its business, it offered Plaintiff a number of alternative accommodations, including a different shift schedule that would minimize his need to eat on the job and a guarantee that it would notify dispatch

26

operators about Plaintiff's condition and advise them to make every effort to

accommodate his requests for breaks.  (Mar. 31, 2009 Letter.)  In conjunction with

Defendant's existing policies that EMTs could use downtime to stop at drive-through

windows, hospital cafeterias, or other food service establishments and could bring a

boxed lunch or snacks to consume inside the ambulance, (*id.*), Defendant had ample

reason to believe that its counter-accommodations would allow Plaintiff to manage his

diabetes.  Thus, this initial response to Plaintiff's accommodation requests evinces good

faith on the part of Defendant, as further highlighted by Ratliff's instruction to Plaintiff

that he should contact her if he found that he was not getting adequate time to eat at

appropriate intervals.  (*Id.*)

　　　In the subsequent months and years, however, it is clear that negotiations over

Plaintiff's accommodation broke down, and Plaintiff claims that Defendant is

responsible.  Primarily, he contends that Defendant's counter-accommodations were

unreasonable because he consistently had shifts where he did not have time to

purchase and consume a meal during the hour window he needed to eat, (Emch Dep.

57:7-11, 132:9-21, Pl.'s Ex. 5), and he could not be made to pack food to eat inside of

the ambulance because doing so was against MIOSHA regulations, (*id.* at 132:22-

133:5).  In Plaintiff's eyes, Defendant's refusal to give him the prescheduled breaks he

requested after the alternative accommodations proved inadequate is evidence of bad

faith.  *See Enforcement Guidance: Reasonable Accommodation & Undue Hardship

Under the Americans with Disabilities Act*, 2002 WL 31994335, at *24 (E.E.O.C.

Guidance Oct. 17, 2002) ("If a reasonable accommodation turns out to be ineffective

and the employee with a disability remains unable to perform an essential function, the

27

employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship.").

Plaintiff's argument misses the mark.  As discussed above, Defendant was justified in rejecting Plaintiff's proposed accommodation because it would unduly burden Defendant's business.  Thereafter, Defendant was obligated only to "meet[] with [Plaintiff], discuss[] any reasonable accommodations, and suggest[] other possible positions for [Plaintiff]."  *Jakubowski*, 627 F.3d at 203.  Defendant nonetheless took "the extra step of proposing counter accommodations," *id.*, and Plaintiff himself admitted at deposition that, with those accommodations, there were times when he was able to eat at the appropriate time, (Emch Dep. 55:18-25)  It was only during those shifts where he was tied up with calls during the four-to-five-hour mark that Plaintiff continued to have difficulties eating, and it is clear from the record that Defendant kept trying to work with Plaintiff to solve this problem.  To this end, Defendant held multiple meetings with Plaintiff to discuss his complaints, (*see* Emails & Notes Re: Breaks; Emch Dep. 53:5-20), repeatedly told its dispatch operators to ensure that Plaintiff was given a break at the appropriate time, (*see* Emails & Notes Re: Breaks), and offered to have a refrigerator installed in his ambulance, (*see* Dec. 27, 2010 Memo).

At the same time, it is clear from the record that Plaintiff responded to Defendant's efforts by meeting every suggestion with a complaint, and obstinately refusing to take advantage of the accommodations that he deemed unacceptable. Plaintiff may have demonstrated a fact issue as to whether one of Defendant's proposals were reasonable—if the door in his ambulance between the driver and passenger compartments would not latch shut and Defendant refused to fix it, (*see*

28

Emch Aff. ¶ 76), MIOSHA regulations would prohibit Plaintiff from eating inside of the

ambulance as Defendant suggested.[5]   Nevertheless, there is no doubt that Plaintiff

simply rejected other accommodations because they were inconvenient or inconsistent

with his inclination.  For example, Plaintiff maintains that he could not take advantage of

cafeterias or eateries at medical facilities while waiting for patients undergoing

procedures because he had ongoing paperwork responsibilities.  (Emch. Aff. ¶ 5).  Yet,

Defendant made clear that only the EMT serving as "technician" was responsible for this

paperwork, and Plaintiff was able to rely on his partner to handle those duties for the

time it would take him to eat.  (Ratliff Dep. 11:18-12:23.)  When asked at deposition why

he did not take advantage of these policies, Plaintiff responded only that, "in [his] eyes,"

it would be inappropriate.  (Emch Dep. 134:21-135:17, Pl.'s Ex. 5.)

Even more inexplicable is Plaintiff's refusal to pack enough food to satisfy his

need for a meal and then consume it outside of the ambulance.  Plaintiff undoubtedly

preferred hot food purchased from a restaurant, but this was not a dietary requirement.

(*Id.* at 56:6-13, Def.'s Ex. 3.)  Plaintiff admits that he brought—and ate—snacks to tide

him over between meals, (*id.* at 70:2-24, Pl.'s Ex. 5), but could not explain why he did

not also bring a sandwich or other, more substantial fare, aside from noting that "pretty

much everything [he] eat[s] is hot," (*see id.* at 53:21-56:20, Def.'s Ex. 3).  Packing a

lunch would significantly cut down the time needed for a meal break, as Plaintiff could

eat at a medical facility or other location between or during calls, instead of needing

---

[5]As a general proposition, however, Plaintiff has not established a genuine fact dispute as to the reasonableness of the proposition that he eat in an ambulance with an adequate door.  There is no question that this practice would be consistent with MIOSHA regulations.  (*See* MIOSHA Q&A.)

additional time to drive somewhere and obtain food.  MIOSHA regulations did not

prohibit storing food in sealed containers inside of the ambulance, and Plaintiff admits

he had hand sanitizer that he could use to clean up before consuming his meal.  (*Id.* at

133:6-134:9, Pl.'s Ex. 5.)  If Plaintiff were to bring with him enough food to meet all his

dietary needs during a shift, it is possible, if not probable, that he could have found

adequate opportunities to eat when required without ever having to consume food

inside of the ambulance.

Because Plaintiff refused point-blank to attempt to work within Defendant's

alternative accommodations, in most cases for completely arbitrary reasons,

Defendant's alleged refusal to propose still more counter-accommodations is not in bad

faith.  Plaintiff was not entitled to turn down reasonable accommodations offered by

Defendant because he would prefer a different accommodation.  *See* 29 C.F.R.

§ 1630.9(d); *Hedrick*, 355 F.3d at 457 ("[A]lthough an employee is not required to

accept an offered accommodation, if an individual rejects a reasonable accommodation,

the individual will no longer be considered a qualified individual with a disability.");

*Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996) ("'[T]he employer providing

the accommodation has the ultimate discretion to choose between effective

accommodations, and may choose the less expensive accommodation or the

accommodation that is easier for it to provide.'" (quoting 29 C.F.R. pt. 1630, app. at

415)).  The evidence shows that Defendant kept attempting to work with Plaintiff to

convince him that its original accommodations would provide him adequate meal

breaks.  It is impossible to know the true efficacy of those accommodations, as Plaintiff

again and again rejected them based on his erroneous belief that Defendant had to give

30

him the prescheduled breaks that he wanted.  It is incontestable that Plaintiff's

inflexibility obstructed the interactive process and kept Defendant from ascertaining

whether its proposed accommodations would allow Plaintiff to perform his job, and

Plaintiff has failed to demonstrate that Defendant should be held responsible for the

breakdown of negotiations over his accommodation request.  *See Kleiber*, 485 F.3d at

871 (quoting *Bultemeyer*, 100 F.3d at 1285).

## B.  ADA Retaliation Claim

Plaintiff next claims that Defendant disciplined him in August 2010 and in January

2011 and eventually terminated him in retaliation for requesting a disability

accommodation and later making internal complaints and filing an EEOC complaint

alleging disability discrimination.[6]  (Compl. ¶¶ 115-21.)  The ADA prohibits

"discriminat[ion] against any individual because such individual has opposed any act or

practice made unlawful by [the ADA] or because such individual made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under [the ADA]."  42 U.S.C. § 12203(a).  To state a prima facie claim for

retaliation under the ADA, Plaintiff must demonstrate that: "(1) []he engaged in a

---

[6]As Defendant points out, Plaintiff's EEOC complaint did not raise a retaliation
claim based upon either the August 2010 and January 2011 disciplines or his
termination.  (*See* Def.'s Statement of Facts ¶ 79, Dkt. # 17.)  Plaintiff's failure to raise
these claims to the agency would normally foreclose him from bringing them in this
court under the ADA's exhaustion provision.  *See* 29 U.S.C. § 626(d); 42 U.S.C.
§§ 12117(a), 2000e-5(e)(1); *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309
(6th Cir. 2000).  However, "filing a timely charge of discrimination with the EEOC is not
a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute
of limitations, is subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World
Airlines, Inc.*, 455 U.S. 385, 393 (1982).  The court must therefore consider the
exhaustion argument forfeited by Defendant's failure to raise it in its summary judgment
motion.

31

protected activity; (2) []he suffered an adverse employment action; and (3) there is a

causal link between the protected activity and the adverse employment action." *Bryson*

*v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007) (citing *Penny v. United Parcel Serv.*,

128 F.3d 408, 417 (6th Cir. 1997)).  "If the plaintiff establishes a prima facie case of

retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory

reason for the adverse employment action. The plaintiff, of course, bears the ultimate

burden of proving that the proffered reason for the action was merely a pretext for

discrimination."  *Penny*, 128 F.3d at 417.

### *1. Protected Activity*

Defendant does not contest that Plaintiff engaged in a protected activity when he

requested an accommodation, *see Baker v. Windsor Republic Doors*, 414 F. App'x 764,

776-77 & n.8 (6th Cir. 2011) (stating that the "showing of a good-faith request for

reasonable accommodations" is a "protected act" under the ADA), or by filing

complaints with the MDHR and EEOC, *see Thomas v. Avon Prods., Inc.*, 276 F. App'x

484, 486 (6th Cir. 2008) (characterizing filing of EEOC complaint as protected activity

for purposes of ADA retaliation claim).  Plaintiff also repeatedly complained to Ratliff

and others that he was not receiving an accommodation that he thought was adequate,

which conduct may also fall within the statute's protection.  *See Simpson v. Vanderbilt

Univ.*, 359 F. App'x 562, 570-71 (6th Cir. 2009);[7] *Davis v. Flexman*, 109 F. Supp. 2d

---

[7]Although *Simpson* and other cases relied upon by the court address Title VII
retaliation claims, they are still applicable to the instant case.  "Retaliation claims are
treated the same whether brought under the ADA or Title VII." *Penny*, 128 F.3d at 417
(citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir.
1997)).

776, 802-03 (S.D. Ohio 1999).  Defendant does not deny that it knew about all of

Plaintiff's protected activities.  *See Steward v. New Chrysler*, 415 F. App'x 632, 643 (6th

Cir. 2011) (including element that "the defendant knew of [the plaintiff's] exercise of her

protected right" in prima facie case of ADA retaliation).  That Plaintiff's allegations of

ADA discrimination ultimately failed does not prevent him from prevailing on his

retaliation claim.  *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304,

1312-13 (6th Cir. 1989) ("A person opposing an apparently discriminatory practice does

not bear the entire risk that it is in fact lawful; he or she must only have a good faith

belief that the practice is unlawful." (collecting cases)).

### 2.  Adverse Employment Action

There is also no dispute that Plaintiff's January 2011 suspension and February

2011 termination are adverse employment actions.  As for the August 2010 written

warning, Plaintiff does not allege that it had a negative impact on his employment or any

other undesirable consequences that "might have dissuaded a reasonable worker from

making or supporting a charge of discrimination."  *Burlington N. & Sante Fe Ry. Co. v.

White*, 548 U.S. 53, 68 (2006).  Thus, it cannot be considered an adverse employment

action.  *See Pines v. Bd. of Regents of Univ. of Mich.*, No. 10-15106, 2012 WL 380242,

at *8 (E.D. Mich. Feb. 6, 2012) (finding that, with respect to written warning that "informs

[the plaintiff] that his behavior was inappropriate and unacceptable and does not impose

significant corrective action[,] . . . reasonable minds could not differ that these events

are insufficient to dissuade a reasonable employee from making a charge of

discrimination"); *Lockett v. Zatko*, No. 3:10 CV 1024, 2011 WL 5588730, at *7 (N.D.

Ohio Nov. 16, 2011) (concluding that no adverse employment action had occurred when

plaintiff alleged retaliation based upon warning that "merely presented Plaintiff with documented evidence of his shortcomings . . . and placed him on notice his conduct violated two company standards"); *Taylor v. Geithner*, No. 08-2735, 2011 WL 2669061, at *13 (W.D. Tenn. July 6, 2011) ("A reasonable worker would not be dissuaded from making or supporting a charge of discrimination by a warning without any effects.").

### 3. Causal Link

Rather, it is the causal-connection element of Plaintiff's prima-facie case that, in Defendant's view, cannot be met.  Plaintiff first requested a disability accommodation in February 2009, almost two years before his suspension and termination; he started complaining about Defendant's refusal to provide prescheduled meal breaks almost immediately, as demonstrated by the MDHR/EEOC complaint he filed on May 26, 2009, more than eighteen months before his suspension and termination; and Plaintiff's most recent EEOC complaint was filed on June 16, 2010, approximately seven months before his suspension and termination.  Defendant avers that the adverse employment actions of which Plaintiff complains are therefore too temporally remote from his protected activities to give rise to an inference of discrimination.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (citation omitted)); *Parnell v. West*, 114 F.3d 1188, at *3 (6th Cir. 1997) (unpublished table decision) ("A time lag of seven months does not necessarily support an inference of a causal link;

previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months.").

Plaintiff responds that two factors establish a causal link between his protected activity and the adverse employment actions: first, he argues that an email from Ratliff on February 7, 2011, is direct evidence that his termination was based on his protected activity; and second, that the course of events leading up to his termination, including his August 2010 discipline and the issuance of the December 27, 2010 memorandum of understanding, show that Defendant had been targeting him for termination. Neither argument has legs.

Plaintiff is simply incorrect that the email sent by Ratliff on February 7, 2011, contains any indication that she or any other manager wanted to fire Plaintiff because of his complaints about ADA discrimination. In that communication, Ratliff conveys her view that Plaintiff's failure to eat during his shift violated the December 27, 2010 memorandum of understanding and expresses frustration that Plaintiff apparently did not take advantage of opportunities to eat that must have arisen during the day. (Email from Sandra Ratliff to Andy Brown, et al. (Feb. 7, 2011, 16:17 EST)), Def.'s Ex. 25, Dkt. # 18-13.) While the email displays irritation at Plaintiff's refusal to abide by Defendant's counter-accommodations and to otherwise engage in the interactive process, there is no allusion to his internal or external complaints of discrimination. Moreover, the decisionmakers responsible for Plaintiff's termination were Wehrs and Curtis, not Ratliff. Ratliff's view of Plaintiff's behavior is not necessarily probative of the actual reasons for Defendant's decision to terminate Plaintiff. *Cf. Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("'[S]tatements by nondecisionmakers, or statements by

35

decisionmakers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden . . . ' of demonstrating animus." (alterations in original) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring))).

Similarly unavailing is Plaintiff's assertion that a causal connection is shown because management "imposed discipline" on him for what he felt were unjustified reasons, "track[ed] [his] union organizing activities," "started questioning [his] FMLA," and "demanded that [he] eat in the ambulance" only after he "sought an accommodation under the ADA and FMLA leave."  (Pl.'s Br. Opp'n to Def.'s Mot. Summ. J. 12.) Evidence that an employer subjects an employee to increased scrutiny after he engages in a protected activity can support a finding of a causal nexus between that activity and a subsequent adverse employment action.  *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009).  Here, though, Plaintiff makes no allegation that his superiors were monitoring his actions so as to find a reason to fire him.  Some of the conduct Plaintiff attributes to Defendant, namely "tracking [his] union organizing activities" and "questioning [his] FMLA," (Pl.'s Br. Opp'n to Def.'s Mot. Summ. J. 12), does not clearly belie such a motive.  Even were the court to read these events in that light, they occurred more than a year after Plaintiff first requested an accommodation and filed his first MDHR/EEOC complaint.  Given that Plaintiff's protected conduct and the adverse employment actions are already so temporally remote, the occurrences cited by Plaintiff are not enough to establish a causal link.  Plaintiff cannot make out a prima facie case of retaliation under the ADA.

### 4. Pretext

36

Even if Plaintiff had stated a prima facie case, his claim could not survive summary judgment because he has not adduced evidence showing that Defendant's proffered reasons for the January 2011 suspension and the February 2011 termination are a mere pretext for retaliation.  To establish pretext, "a plaintiff may demonstrate that the proffered reason '(1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) [was] insufficient to motivate the employer's action.'"  *Baker*, 414 F. App'x at 778 (alteration in original) (quoting *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010)).  This requires Plaintiff to "allege more than a dispute over the facts upon which his discharge was based"; he must also "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

As with his arguments concerning causal nexus, Plaintiff devotes next to no discussion as to why Defendant's reason for suspending him was pretextual.  According to Defendant, the January 6, 2011 discipline was imposed because Plaintiff neglected on three occasions to follow the policy that an EMT team must call clear before leaving the destination of their previous call.  Plaintiff obliquely claims that this averment "does not stand up to scrutiny," (Pl.'s Br. Opp'n to Def.'s Mot. Summ. J. 13), presumably referring to his factual allegations that Defendant's actual policy was for EMTs to call clear after completing the paperwork for a call, (Emch Dep. 151:8-152:6, Pl.'s Ex. 5), and that most if not all of Defendant's other EMTs had departed the scene of a call before calling clear without being subjected to discipline, (*id.* at 161:4-20).  These bare assertions do not create a genuine dispute of fact.  Wehrs testified at deposition that,

37

although the relevant policy was not recorded in the company handbook, he had gone over it at staff meetings. (Wehrs Dep. 72:21-73:14.) Even more tellingly, it was other EMTs, not the managers who allegedly had it in for Plaintiff, that initially reported Plaintiff's violation of the policy. (*See* Borkowski Incident Report; Johnson Incident Report.) Plaintiff's second claim that other employees had not been disciplined for the same conduct is explicitly contradicted by the record, as both of Plaintiff's partners on the occasions in question were also given one week suspensions. (*See* Nowacki Corrective Action Notice; Rush Corrective Action Notice.)

Plaintiff presents a somewhat more developed analysis as to why Defendant's purported reason for terminating him—violating the December 27, 2010 memorandum by failing to eat during his February 7, 2011 shift—is pretextual. He contends that, by representing that it could not provide him prescheduled meal breaks at four-hour intervals during his shift, Defendant acknowledged that it was impossible for him to eat properly during the work day, and so it set an unattainable standard in requiring him to do just that.

Plaintiff has misinterpreted the evidence. Defendant's refusal of Plaintiff's preferred accommodation in lieu of less burdensome counter-accommodations was not a tacit admission that Plaintiff could not be accommodated. Apparent in the record is Defendant's honest belief that, if Plaintiff took advantage of its alternate accommodations, he would have ample opportunity to eat in a manner consistent with his dietary requirements. (*See, e.g.*, Dec. 27, 2010 Memorandum 1-2 (documenting instances of Plaintiff's "failure to participate in good faith in the ADA interactive process").) The December 27th memorandum was a warning that, if Plaintiff did not

38

start trying to manage his disease within Defendant's proposed accommodations, he would no longer be considered qualified for his position and Defendant would have grounds for firing him.  *See Hedrick*, 355 F.3d at 457.  At this point, after almost two years of enduring Plaintiff's stubborn refusal to engage in the interactive process, this was an entirely tenable position for Defendant to take.  *Cf. Seifken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995) (ruling that diabetic plaintiff's "failure to alertly and accurately keep himself functional and monitor his disease" is permissible ground for termination, when doing so did not require accommodation by employer).

Notwithstanding Plaintiff's insistence that there is a fact dispute as to whether he did have the time and opportunity to eat during his February 7, 2011 shift, there is unequivocal evidence that Defendant honestly believed his conduct on that date violated the December 27 memorandum.  *See Braithwaite*, 258 F.3d at 493-94. Plaintiff's partner for that shift told Ratliff, who relayed the information to Wehrs and Curtis, that Plaintiff could have consumed a meal shortly after he complained to dispatch about needing a break.[8]  (Feb. 9, 2011 Email.)  Plaintiff has told, and Wehrs

---

[8]Plaintiff maintains that Ratliff's summary of statements made by Plaintiff's partner is inadmissible hearsay and, as such, cannot be considered by the court when determining Defendant's summary judgment motion.  Plaintiff is correct that, as a general proposition, a court must disregard inadmissible evidence, including hearsay, on summary judgment.  *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). However, Defendant does not offer the statements of Plaintiff's partner to prove the truth of the matter asserted—that Plaintiff actually had adequate time to eat during the February 7th shift—but to show that Defendant's managers *believed* Plaintiff could have eaten in the appropriate time frame.  Thus, the statements are not hearsay.  *See* Fed. R. Evid. 801(c)(2); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) ("[W]itness statements contained in an investigative report may be considered on summary judgment 'not to prove their truth, . . . but to demonstrate the state of mind and motive of Defendant's managers in discharging Plaintiff.'" (alteration in original) (quoting *Haughton v. Orchard Automation*, 206 F. App'x 524, 532 (6th Cir. 2006))).

has consistently testified, that this refusal to eat in defiance of the December 27th memorandum was the reason for Plaintiff's termination.  Plaintiff has not shown that a retaliatory motive more likely precipitated this adverse employment action, and so his ADA retaliation claim fails.

### C.  FMLA Claim

Finally, Plaintiff avers that he was unlawfully terminated in retaliation for taking FMLA-qualifying leave on February 7, 2011.  (Compl. ¶¶ 132-39.)  As the Sixth Circuit recently explained:

> The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id.* at § 2615(a)(2). Consistent with these proscriptions, "[e]mployers may not discriminate against employees on FMLA leave in the administration of their paid leave policies." 29 C.F.R. § 825.207(a). Employers who violate the FMLA are liable to the employee for damages and such equitable relief as may be appropriate. 29 U.S.C. § 2617(a)(1). . . .

> Our court has recognized two discrete theories of recovery under the FMLA: (1) the so-called "interference" or "entitlement" theory arising from§ 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising from § 2615(a)(2). [*Hunter v. Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003).] Although we have held that a claim for retaliatory discharge is cognizable under either theory, the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Arban*, 345 F.3d at 401. The central issue raised by the retaliation theory, on the other hand, is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted). In contrast to the interference theory, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id.*

40

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012).

Plaintiff seeks to proceed on both a interference and a retaliation theory. To establish an interference claim, he must first demonstrate a prima facie case by showing that: (1) he was an eligible employee; (2) Defendant was an employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave Defendant notice of his intention to take leave; and (5) Defendant denied him FMLA benefits to which he was entitled. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). A prima facie case of FMLA retaliation, on the other hand, requires proof of the following elements: (1) Plaintiff was engaged in an activity protected by the FMLA; (2) Defendant knew that Plaintiff was exercising his rights under the FMLA; (3) after learning of Plaintiff's exercise of FMLA rights, Defendant took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Id.*

Plaintiff may be able to make out a prima facie case of either interference or retaliation in violation of the FMLA. As to the first, Defendant challenges only the fifth element—whether it denied Plaintiff any FMLA benefits to which he was entitled—by pointing out that it never refused Plaintiff's request to take intermittent FMLA leave. However, it is well established that the FMLA's prohibition from "interfering, restraining, or denying the exercise of" any FMLA right, 29 U.S.C. § 2615(a)(1), encompasses retaliatory discharge for taking leave, *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446-47 (6th Cir. 2007). When an interference claim takes this form, the fifth factor becomes an issue of whether an employer "'somehow used the leave against [the employee] in an unlawful manner, as provided in either the statute or the regulations.'" *Id.* at 447

41

2:11-cv-13275-RHC-LJM   Doc # 23   Filed 09/17/12   Pg 42 of 44   Pg ID 908

(quoting *Bradley v. Mary Rutan Hosp.*, 322 F. Supp. 2d 926, 940 (S.D. Ohio 2004)).

The record suggests that Defendant considered eating at proper intervals an essential

requirement of Plaintiff's job at least in part because, when he failed to do so, he often

had to utilize FMLA time to end a shift early or take off entire days, leaving Defendant

short-handed.  (*See* Feb. 7, 2011 Email from Ratliff; Def.'s Br. Supp. Mot. Summ. J. 5-

6.)  This may be enough to create a fact issue as to whether Plaintiff's FMLA absences

factored into Defendant's termination decision, which, after all, was made only a few

days after Plaintiff utilized sick leave on February 7, 2011.

      For the same reasons, Plaintiff might have adduced enough evidence to show

that his termination was causally linked to taking FMLA leave, which is a protected

activity for the purposes of a retaliation claim.  *See Bryant v. Dollar Gen. Corp.*, 538

F.3d 394, 401-02 (6th Cir. 2008).  Defendant's argument on this facet of Plaintiff's claim

is only that, because Plaintiff did not testify at deposition that he believed his termination

to be motivated by his use of FMLA leave, (*see* Emch Dep. 18:25-19:23), he cannot

"contradict" that testimony by bringing a claim for FMLA retaliation based upon his

termination, (Def.'s Br. Supp. Mot. Summ. J. 19).  This contention is not well taken.

Plaintiff's complaint plainly states that his FMLA claim is grounded in his termination,

and Plaintiff's deposition testimony does not contravene this;  Plaintiff's failure to include

his FMLA absences when asked to list the reasons he thought he was terminated can

be used as evidence to undercut his claims, but it does not foreclose him from asserting

a particular legal position.  *See Whitesell Corp. v. Whirlpool Corp.*, No. 1:05-CV-679, at

*1 (W.D. Mich. Oct. 30, 2009) (noting that plaintiff's deposition testimony as to scope of

its claims binds it only insofar as it can be used as impeachment evidence).

On the other hand, the evidence suggests a possible fact issue as to whether Plaintiff's February 7, 2011, absence was covered by the FMLA, as Plaintiff's 2011 certification was still pending approval.  Additionally, there is no clear indication in the record that, when Defendant asked to go home early on February 7th, he gave notice that he intended to use FMLA leave.  While either of these factors may ultimately defeat Plaintiff's prima facie cases, they are not developed in Defendant's brief and, fortunately, the court need not pay them much heed at this juncture.  Both interference and retaliation claims brought under the FMLA are subject to the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): if Defendant can proffer a legitimate, non-discriminatory reason for Plaintiff's termination, Plaintiff's FMLA claim will fail unless he can show that reason is pretextual.  *Donald*, 667 F.3d at 757. As discussed in the previous section, Plaintiff has not met this burden, and so summary judgment is also warranted on his claim under the FMLA.

## IV.  CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendant's motion for summary judgment [Dkt. # 17] is GRANTED.

 s/Robert H. Cleland_____
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 17, 2012


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 17, 2012, by electronic and/or ordinary mail.

 s/Lisa G. Wagner_____
Case Manager and Deputy Clerk

43

(313) 234-5522